UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT MUELLER,

     Applicant,

v.                                  CASE NO. 8:17-cv-823-SDM-UAM

SECRETARY, Department of Corrections,

     Respondent.
_____/

## **ORDER**

     Mueller applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 1) and challenges his convictions for attempted second-degree murder, aggravated battery, and discharging a firearm in public, for which he was sentenced to forty years' imprisonment. Numerous exhibits ("Respondent's Exhibit __") support the response. (Doc. 9) The respondent concedes that the application is timely but argues that some grounds are unexhausted and procedurally defaulted. (Doc. 8)

## I. **BACKGROUND**[1]

     On the evening of February 5, 2007, Mueller was driving around Tarpon Springs, Florida, with a female companion. Mueller pulled over and attempted to purchase $40 worth of crack cocaine from two men, John Murray and John Hayes. Mueller said he "wanted to taste the product" first. (Respondent's Exhibit 19 at 419)

---

[1] This summary of the facts derives from the trial transcript. (Respondent's Exhibit 19)

Murray responded, "No, I need to see the money."  (Respondent's Exhibit 19 at 419)
The two argued for some time, and Murray began to walk away from the car.
Mueller shouted, "F***ing n****r," shot Murray in the back with a revolver, and
fled.[2]  (Respondent's Exhibit 19 at 369)  Murray survived his gunshot wound.

Later that evening, Mueller drove to the house of Brian Barnes, a friend for
whom he had done some construction work.  At the time, the two were quarreling
over money.  Twenty minutes before Mueller arrived at the house, he had called
Barnes and threatened to kill him.  As he approached the residence, Mueller fired his
revolver in the direction of the house.  One bullet struck a car parked in the
driveway.  Barnes was elsewhere at the time of the shooting, but his wife and
children were inside the house.  They were unharmed.

Mueller left Barnes's house and returned to the house where he was staying.
The owner of the house, Thomas Muessig, was a convicted felon.  Muessig was
upset that Mueller had brought a gun to the residence, and the two began to argue.
Mueller ended the argument by striking Muessig in the face with the gun.

Following a jury trial, Mueller was convicted of attempted second-degree
murder, aggravated battery, and discharging a firearm in public.  The state appellate
court vacated the conviction for attempted second-degree murder based on an error
in the jury instructions.  *Mueller v. State*, 100 So. 3d 47, 50 (Fla. 2d DCA 2011).  The
court affirmed the other convictions.  Although counsel represented him during the

---

[2] Mueller is white; Murray and Hayes are African American.

first trial, Mueller proceeded *pro se* at the re-trial.  The jury found him guilty of attempted second-degree murder, and the state appellate court affirmed without a written opinion.

## II.  EXHAUSTION AND PROCEDURAL BAR

Ground one of the application contains six sub-claims.  (Doc. 1 at 5–6)  The respondent argues that each sub-claim is barred from federal review because Mueller failed to exhaust his state court remedies.  (Doc. 8 at 6, 14)  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *accord Rose v. Lundy*, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error.").  An applicant must present to the federal court the same claim presented to the state court.  *See Picard*, 404 U.S. at 275 ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.").  "Mere similarity of claims is insufficient to exhaust."  *Henry*, 513 U.S. at 366.

As *Baldwin v. Reese*, 541 U.S. 27, 32 (2004), explains, an applicant must alert the state court that he is raising a federal claim and not just a state law claim:

> A litigant wishing to raise a federal issue can easily
> indicate the federal law basis for his claim in a state court
> petition or brief, for example, by citing in conjunction with

the claim the federal source of law on which he relies or a
case deciding such a claim on federal grounds, or by
simply labeling the claim "federal."

"It is not enough that all the facts necessary to support the federal claim were before

the state courts, or that a somewhat similar state law claim was made." *Anderson v.*

*Harless*, 459 U.S. 4, 6 (1982).  Consequently, "a petitioner with a claim that could

arise under state or federal law must clearly indicate to the state courts that he

intends to bring a federal claim." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458

(11th Cir. 2015).

### Ground One, Sub-Claim A:

Mueller asserts that the trial court violated the Sixth Amendment by

conducting an inadequate *Faretta*[3] inquiry.  (Doc. 1 at 5)  According to Mueller, the

court failed to establish that he understood "the offer of counsel," that his waiver of

the right to counsel was "knowing and intelligent," and that he did not "suffer[] from

severe mental illness."  (Doc. 1 at 5)  Mueller raised the same claim on direct appeal.

He argued that "[r]eversal was required" based on the court's "insufficient *Faretta*

inquiry," which allegedly failed to establish his "comprehension of the offer of

counsel," failed to establish his "capacity to make a knowing and intelligent waiver,"

and failed to establish whether he "suffer[ed] from severe mental illness."

(Respondent's Exhibit 24 at 25–26)  Consequently, ground one, sub-claim A is

exhausted.

---

[3] *Faretta v. California*, 422 U.S. 806 (1975).

**Ground One, Sub-Claim B:**

Mueller claims that the trial court violated his Sixth Amendment right of confrontation (1) by restricting his cross-examination of witnesses and (2) by denying his request to call state investigator Gary Gibson as a witness at trial. (Doc. 1 at 5; Doc. 18 at 5–6) Mueller raised this claim on direct appeal. He contended that the trial court erred in "refus[ing] to allow [him] to complete his cross-examination of witnesses" and "further erred in refusing to allow [him] to call [i]nvestigator Gibson as a witness at trial." (Respondent's Exhibit 24 at 9–12, 29) In support, Mueller cited *Holley v. State*, 48 So. 3d 916 (Fla. 4th DCA 2010). (Respondent's Exhibit 24 at 31) *Holley* held that "the defendant's Sixth Amendment right to confront" witnesses was "violated" by the trial court's restriction on cross-examination of a witness. 48 So. 3d at 920–21. Because *Holley* rested in part on federal constitutional grounds, Mueller's citation of that decision sufficed to alert the state court to the federal nature of his claim. *See Wells v. Sec'y Dep't of Corr.*, 343 F. App'x 581, 584 (11th Cir. 2009) (holding that petitioner fairly presented federal claim where he "cited and discussed only one case," a "Florida appellate [decision]" that resolved claim on federal constitutional grounds).[4] As a consequence, ground one, sub-claim B is exhausted.

**Ground One, Sub-Claims C, D, E, and F:**

In the remainder of ground one, Mueller asserts that his federal constitutional rights were violated because (1) the trial court prohibited his arguing to the jury that

---

[4] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

"his arrest was illegal" (sub-claim C); (2) the trial court "repeatedly treated [him] with disdain, disrespect, and disparagement in front of the jury and allowed the State to do the same" (sub-claim D); (3) the trial court refused to "allow [him] to impeach three . . . witnesses with prior inconsistent statements" (sub-claim E); and (4) the "cumulative effect" of the alleged "evidentiary errors" denied him a "[f]air and [i]mpartial [t]rial" (sub-claim F).  (Doc. 1 at 5–6)

Mueller raised similar claims on direct appeal, but he failed to make the state court aware that they "present[ed] federal constitutional issues." *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1352 (11th Cir. 2012).  Mueller did not argue that the trial court's alleged errors violated any federal right.  Nor did he cite any provision of the federal constitution.  Instead, he relied entirely on Florida law in challenging the trial court's rulings.  (Respondent's Exhibit 24 at 32–43)  Accordingly, Mueller did not "fairly present" these federal claims to the state court.  *See Baldwin*, 541 U.S. at 27.

Because sub-claims C, D, E, and F are unexhausted, they are barred from federal review absent a showing of "actual cause and prejudice" or "manifest injustice." *Coleman v. Thompson*, 501 U.S. 72, 29–30 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  The basis for "cause" must ordinarily reside in something external to the defense.  *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).  To show "prejudice," the applicant must establish "not merely that the errors . . . created the *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*,

456 U.S. 152, 170 (1982)).  A fundamental miscarriage of justice occurs only if a constitutional violation has probably resulted in the conviction of someone who is actually innocent.  *House v. Bell*, 547 U.S. 518, 536–37 (2006).  A petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *House*, 547 U.S. at 536–37 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Mueller fails to establish either cause and prejudice or a fundamental miscarriage of justice.  Therefore, sub-claims C, D, E, and F of ground one are procedurally barred from federal review.  Sub-claims A and B are, however, entitled to a review on the merits.

### III. <u>STANDARD OF REVIEW</u>

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding.  *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State
court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power
> of a federal habeas court to grant a state prisoner's
> application for a writ of habeas corpus with respect to
> claims adjudicated on the merits in state court. Under §
> 2254(d)(1), the writ may issue only if one of the following
> two conditions is satisfied — the state court adjudication
> resulted in a decision that (1) "was contrary to . . . clearly
> established Federal law, as determined by the Supreme
> Court of the United States" or (2) "involved an
> unreasonable application of . . . clearly established Federal
> law, as determined by the Supreme Court of the United
> States." Under the "contrary to" clause, a federal habeas
> court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case
> differently than this Court has on a set of materially
> indistinguishable facts. Under the "unreasonable
> application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established

federal law is objectively unreasonable[;] . . . an unreasonable application is different

from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for

obtaining habeas corpus from a federal court, a state prisoner must show that the

state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562

U.S. 86, 103 (2011). *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical

point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if,

and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question . . . ."); *Woods v. Donald*, 575 U.S. 312, 316 (2015) ("And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citing *Woodall*, 572 U.S. at 419). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the

opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion, the state appellate court on direct appeal affirmed Mueller's conviction and sentence for attempted second-degree murder. (Respondent's Exhibit 26) Similarly, in another *per curiam* decision without a written opinion, the state appellate court denied Mueller's petition alleging ineffective assistance of appellate counsel. (Respondent's Exhibit 35) The state appellate court's *per curiam* decisions warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), *and Bishop v. Warden*, 726 F.3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

Mueller bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).

## IV. ISSUES ON DIRECT APPEAL

### Ground One, Sub-Claim A:

Mueller asserts that the trial court violated the Sixth Amendment by failing to "conduct a proper *Faretta* inquiry." (Doc. 1 at 5) According to Mueller, the *Faretta* inquiry was inadequate because the court failed to establish that (1) he understood "the offer of counsel," (2) his waiver of the right to counsel was "knowing and intelligent," and (3) he did not "suffer[] from severe mental illness." (Doc. 1 at 5)

The state appellate court rejected this claim in a *per curiam* decision without a written opinion.  (Respondent's Exhibit 26)  Consequently, Mueller must show that the state court's decision possessed "no reasonable basis."  *Richter*, 562 U.S. at 98.  He cannot meet his burden.

"The Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process."  *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004).  But a defendant also "has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so."  *Faretta*, 422 U.S. at 807.  "*Faretta* provides that when a defendant requests to discharge counsel and to proceed *pro se*, a trial court should conduct an inquiry and make the defendant 'aware of the dangers and disadvantages of self-representation, so that the record . . . establish[es] that [the defendant] knows what he is doing and his choice is made with eyes open.'"  *Tuomi v. Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 798 (11th Cir. 2020) (quoting *Faretta*, 422 U.S. at 835).

"The ideal method of assuring a voluntary waiver is for the trial judge to conduct a pre-trial hearing at which the defendant would be informed of the charges, basic trial procedures, and the hazards of self-representation."  *United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014).  The Supreme Court has not, however, "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel."  *Tovar*, 541 U.S. at 88.  "The core inquiry is whether the defendant understood the choices before him and the potential dangers of

proceeding *pro se*." *Jones v. Walker*, 540 F.3d 1277, 1293 (11th Cir. 2008). "If so, his waiver is valid." *Id.*

The trial court conducted a proper *Faretta* inquiry, after which Mueller knowingly and voluntarily waived his right to counsel. Four months before the retrial on the attempted murder charge, Mueller told the court during a pretrial hearing that he "want[ed] to represent" himself. (Respondent's Exhibit 9 at 7) The court responded that self-representation would be "silly" and "ridiculous" and "put[] you[] at a tremendous disadvantage." (Respondent's Exhibit 9 at 8) The court proceeded to "conduct a *Faretta* hearing" because Mueller had "indicated he wanted to represent himself." (Respondent's Exhibit 9 at 10) In response to the court's questions, Mueller disclosed that he was a high school dropout with no formal legal training, but that he could "read and write." (Respondent's Exhibit 9 at 10–11) The court explained to Mueller that if he represented himself, he would be "responsible for . . . following the rules." (Respondent's Exhibit 9 at 12) To emphasize the point, the court noted that "on one side" "you ha[ve] [the prosecutor]," who "knows the rules, knows the law, knows the Evidence Code, and you have you on the other side." (Respondent's Exhibit 9 at 13) Also, the court reminded Mueller that he had "already [gone] to trial once and lost." (Respondent's Exhibit 9 at 12)

The court explained that Mueller faced a mandatory minimum sentence of twenty-five years' imprisonment, and the prosecutor noted that the statutory maximum was life in prison. The court reiterated that "[a]ny of the things [] a lawyer would be able to do, you're realistically not going to be able to do."

(Respondent's Exhibit 9 at 13)  This included "setting up depos," which would require Mueller to "go through the whole jail bureaucracy."  (Respondent's Exhibit 9 at 13)  Also, the court informed Mueller that he did not "have to maintain [his] self-representation throughout this process," and that he could "decide at some future time that [he] want[ed] [his] lawyer back."  (Respondent's Exhibit 9 at 15)

Following this colloquy, the court asked Mueller whether, "even understanding the disadvantages that we've discussed and the possible penalties," he still wished to represent himself.  (Respondent's Exhibit 9 at 16)  Mueller answered yes.  (Respondent's Exhibit 9 at 16)  The court allowed Mueller to proceed *pro se* and appointed his public defender as standby counsel.  At subsequent pretrial hearings, the court asked Mueller at least six times whether he would continue representing himself.  Each time, Mueller answered in the affirmative.  (Respondent's Exhibit 10 at 3; Exhibit 11 at 5, 122; Exhibit 12 at 3; Exhibit 13 at 8; Exhibit 15 at 49)

The record establishes that Mueller chose to represent himself "with eyes open."  *Tovar*, 541 U.S. at 88.  During the *Faretta* inquiry, the court (1) reminded Mueller of the dangers of proceeding *pro se*, (2) warned Mueller that self-representation created a "tremendous disadvantage," (3) described the potential penalties Mueller faced if convicted, and (4) reminded Mueller that the jury had found him guilty of attempted second-degree murder at the first trial.  Despite these warnings, Mueller elected to represent himself.  Because Mueller "understood the choices before him and the potential dangers of proceeding *pro se*," he knowingly and voluntarily waived his right to counsel.  *Jones*, 540 F.3d at 1293; *see also Tuomi*, 980

F.3d at 799 (holding that "*Faretta*-based challenge to the validity of [petitioner's] waiver of his right to counsel did not have a reasonable probability of success" because trial court "made [petitioner] aware of the dangers and disadvantages of *pro se* representation as well as the charges against him and the potential sentence he faced"). Therefore, the state court reasonably rejected Mueller's *Faretta* claim.

Mueller resists this conclusion and contends that the trial court erroneously failed to "make on the record determinations" that his "waiver [was] free and voluntary." (Doc. 18 at 4) This argument lacks merit. The court did not expressly state that Mueller's waiver was knowing and voluntary, but it does not follow that the court violated *Faretta*. A trial court "ideally . . . should . . . make an explicit finding that [the defendant] has chosen to represent himself with adequate knowledge of the possible consequences." *Nelson v. Alabama*, 292 F.3d 1291, 1295 (11th Cir. 2002). "The failure to do so, however, is not error as a matter of law." *Id.* If the "trial record shows that a defendant knowingly and voluntarily elected to represent himself, the *Faretta* standard will be satisfied." *Id.* As determined above, the record establishes that Mueller elected to proceed *pro se* "with eyes open." *Tovar*, 541 U.S. at 88. Thus, the court complied with *Faretta*.

Also, Mueller faults the trial court for failing to ask whether he "suffered from severe mental illness." (Doc. 1 at 5) But Mueller "did not show, and has not shown, that he suffered from a significant mental illness to such an extent that his choice must not be considered intelligent." *United States v. Posadas-Aguilera*, 336 F. App'x 970, 976 (11th Cir. 2009); *see also United States v. Jackson*, 859 F. App'x 389, 390 (11th

Cir. 2021) (rejecting *Faretta*-based argument that "the district court needed to make a more specific inquiry into [defendant's] mental health" because defendant "hasn't contended here that he was or is severely mentally ill").

Because the *Faretta* claim is meritless, ground one, sub-claim A is denied.[5]

**Ground One, Sub-Claim B:**

Mueller asserts that the trial court violated his Sixth Amendment right of confrontation by (1) restricting his cross-examination of Officer Barry Wireman and Detective Scott Brockew and (2) denying his request to call state investigator Gary Gibson as a witness at trial. (Doc. 1 at 5; Doc. 18 at 5–6; Respondent's Exhibit 24 at 9–12, 29) The state appellate court rejected this claim in a *per curiam* decision without a written opinion. (Respondent's Exhibit 26) As a consequence, Mueller bears the burden of showing "no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

The Confrontation Clause requires "a full and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985). But the Clause guarantees only "an

---

[5] Mueller faults the trial court for "fail[ing] to renew the offer of assistance of counsel . . . at each critical stage of the prosecution." (Doc. 1 at 5) But "[t]here is no clearly established Supreme Court law on when the Sixth Amendment requires an additional waiver of counsel." *McClain v. Sec'y, Dep't of Corr.*, 855 F. App'x 610, 613 (11th Cir. 2021); *accord Duncan v. Sec'y, Fla. Dep't of Corr.*, No. 3:18-cv-2099-MCR-GRJ, 2021 WL 4464431, at *12 (N.D. Fla. Aug. 20, 2021) ("Petitioner does not have a constitutional right to a renewed offer of counsel at all pretrial proceedings and during the evidentiary portion of trial."), *adopted by* 2021 WL 4465996 (N.D. Fla. Sept. 29, 2021). Regardless, the trial court repeatedly offered Mueller the assistance of counsel after his initial waiver, and each time he declined the offer.

*opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [] cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness's credibility had counsel pursued the proposed line of cross-examination." *United States v. Williams*, 526 F.3d 1312, 1319 (11th Cir. 2008); *see also Van Arsdall*, 475 U.S. at 680 ("[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.").

Mueller fails to show that the trial court improperly limited his right to confront witnesses. He complains that during a pretrial suppression hearing, the court "cut off" his cross-examination of Officer Wireman, one of the officers who detained him outside his house. (Respondent's Exhibit 24 at 9, 29) Mueller's cross-examination of this witness spanned twenty transcript pages. (Respondent's Exhibit 11 at 56–76) The questions focused on whether Officer Wireman had reasonable suspicion to believe that Mueller had fired a gun at his friend's house. Also, Mueller

attempted to impeach Officer Wireman with statements from his police report.  The court ended the cross-examination after Mueller accused the witness of perjury. (Respondent's Exhibit 11 at 76)  Mueller's application fails to identify any questions he was prevented from asking that would have significantly altered the court's "impression of [Officer Wireman's] credibility."  *Williams*, 526 F.3d at 1319. Consequently, he has not shown that the court improperly limited his cross-examination of this witness.

Mueller likewise fails to show that the court violated the Confrontation Clause by restricting his cross-examination at trial of Detective Brockew, the lead investigator on the case.  Mueller's initial cross-examination of this witness spanned thirty-six transcript pages and covered several topics, including (1) whether law enforcement had probable cause to arrest Mueller, (2) the owner of the vehicle Mueller was driving during his crime spree, and (3) Detective Brockew's background and investigative practices.  (Respondent's Exhibit 19 at 313–49)  In addition, Mueller asked several improper questions during his examination.  For example, Mueller asked Detective Brockew whether he was "aware that if you file an affidavit or you make an arrest for any offense that occurs outside your presence, it's illegal." (Respondent's Exhibit 19 at 342)  Also, he posed the following hypothetical:  "If I tell you right now that — can I use you?  Mr. Koskinas [the prosecutor] [] just shot this typing lady here, stenograph lady.  Say I just tell you that he shot her.  Can you arrest him and charge him with attempted murder?"  (Respondent's Exhibit 19 at 336)  After sustaining several objections to Mueller's inappropriate questions, the

court ended the cross-examination and told him to "[h]ave a seat."  (Respondent's
Exhibit 19 at 350)

The prosecution recalled Detective Brockew toward the end of its case.  This
time, Mueller's cross-examination covered (1) the ballistics evidence recovered from
the crime scenes, (2) the date of Hayes's identification of Mueller as the man who
shot Murray, and (3) whether Detective Brockew arrested Mueller or merely
detained him.  (Respondent's Exhibit 19 at 636–51)  The court ended the cross-
examination after Mueller asked for the second time whether Detective Brockew had
"arrest[ed] [him] before [] transport[ing] him [] to the police station."  (Respondent's
Exhibit 19 at 650–51)

The record shows that Mueller had ample "opportunity for effective cross-
examination" of Detective Brockew.  *Fensterer*, 474 U.S. at 20 (emphasis omitted).
The court sustained several objections to Mueller's questions, but in each instance
the court acted within its discretion to impose "reasonable limits" on cross-
examination based on "confusion of the issues" or "interrogation that [was]
repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at 679.  Moreover,
Mueller fails to identify any unasked questions that would have created "a
significantly different impression of [Detective Brockew's] credibility."  *Williams*, 526
F.3d at 1319.  Therefore, Mueller has not shown that the court improperly restricted
his cross-examination of this witness.

Lastly, Mueller contends that the court violated his right of confrontation by
denying his request to call state investigator Gary Gibson as a witness at the second

trial.  During the first trial, the jury heard testimony from (1) Torrey Ritchie, the woman who was in the car when Mueller shot Murray, and (2) Thomas Muessig, the man Mueller pistol-whipped after the shootings.  Shortly before the second trial, the prosecution moved to admit Ritchie and Muessig's testimony from the first trial on the ground that these witnesses were now unavailable.  *See Essex v. State*, 958 So. 2d 431, 432 (Fla. 4th DCA 2007) ("Under the Florida Evidence Code, former testimony is admissible 'provided that the declarant is unavailable as a witness.'") (quoting Fla. Stat. § 90.804(2)(a)).

The court held an evidentiary hearing on the motion.  Gibson, the state investigator, testified that Muessig had passed away in 2012, and he described several unsuccessful attempts to locate Ritchie.  (Respondent's Exhibit 15 at 7)  Gibson had spoken with Ritchie's mother and sister, who told him that she "doesn't have a phone" or address.  (Respondent's Exhibit 15 at 8)  Also, Gibson represented that Ritchie "doesn't use her name . . . or [S]ocial [S]ecurity number on anything that can be traced."  (Respondent's Exhibit 15 at 9)  Gibson determined that Ritchie lived "in the Maitland, Florida area," but he could not locate an address.  (Respondent's Exhibit 15 at 8)  Mueller cross-examined Gibson about the steps he took to verify Muessig's passing and whether he had obtained "any address" for Ritchie. (Respondent's Exhibit 15 at 10–15)  The court granted the prosecution's motion to admit the former testimony, reasoning that Muessig was "deceased" and Ritchie "can't be found despite diligent effort to do so."  (Respondent's Exhibit 15 at 27–28)

Shortly before the jury was sworn, Mueller asked the court for permission to "talk to [] [i]nvestigator Gibson" again because he did not "feel [Gibson] did an adequate investigation on [Ritchie]." (Respondent's Exhibit 19 at 208)  The court denied the request and explained that Mueller's "opportunity to cross-examine [Gibson] [h]as already gone and passed." (Doc. 24-2 at 209)  When the prosecutor announced his intention to read Ritchie's former testimony into evidence, Mueller renewed his request to call Gibson.  The court again denied the request and repeated that Mueller already "had opportunities . . . to ask questions" of Gibson. (Respondent's Exhibit 19 at 505)  Later in the trial, the court rejected Mueller's request to read into the record "the questions that [he] want[ed] to ask" Gibson. (Respondent's Exhibit 19 at 609)

The court did not violate the Sixth Amendment by denying Mueller's request to call Gibson at trial.  The Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20.  Mueller had an "opportunity for effective cross-examination" of Gibson during the pretrial hearing on the prosecution's motion to admit former testimony.  *Fensterer*, 474 U.S. at 20 (emphasis omitted).  Moreover, Mueller's application fails to identify any questions he would have asked Gibson if permitted to call him at trial.  Consequently, Mueller fails to show that additional cross-examination would have led to "a significantly different impression of [Gibson's] credibility." *Williams*, 526 F.3d at 1319.

Because Mueller's Confrontation Clause challenges lack merit, ground one, sub-claim B is denied.[6]

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Mueller claims ineffective assistance of appellate counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
> > First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

---

[6] Mueller alleges that the restrictions on his cross-examination of witnesses violated his right to "Equal Protection of the Law." (Doc. 1 at 5) Nothing in the application or the record suggests that the trial court violated Mueller's right to equal protection.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Mueller must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden, Mueller must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Mueller cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely

to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

The *Strickland* standard of review applies to a claim of ineffective assistance of appellate counsel. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). To establish such a claim, Mueller must show both that appellate counsel performed deficiently and that the deficient performance resulted in prejudice. To demonstrate deficient performance, Mueller must show that appellate counsel's failure to discover a non-frivolous issue and file a merits brief raising that issue fell outside the range of professionally acceptable performance. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). To demonstrate prejudice, Mueller must show that a reasonable probability exists that, but for appellate counsel's unreasonable failure to file a merits brief on a particular issue, Mueller would have prevailed on appeal. *Smith*, 528 U.S. at 285–86.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *See Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry"

and not independently assessing whether counsel's actions were reasonable. *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

**<u>Ground Two:</u>**

Mueller asserts that appellate counsel provided ineffective assistance by failing to challenge on direct appeal the trial court's denial of two motions to suppress. (Doc. 1 at 7–8) In the first motion to suppress, Mueller argued that all post-arrest identifications of him were "illegally obtained" because law enforcement lacked probable cause to transport him to the police station. (Respondent's Exhibit 17) The court held a lengthy suppression hearing and took testimony from Detective Brockew and Officer Wireman. (Respondent's Exhibit 11) Detective Brockew testified that he responded to the scene of a shooting "in the 500 block of Lime Street." (Respondent's Exhibit 11 at 11) Eyewitnesses told law enforcement that they had seen a "gold-colored four-door car" with "a distinctive muffler" and "significant rear end damage" leaving the scene of the shooting. (Respondent's Exhibit 11 at 12–13) Soon after Detective Brockew left the scene, he heard a radio dispatch about a "drive-by shooting" at Brian Barnes's house. (Respondent's Exhibit 11 at 13–14) Law enforcement spoke to Barnes, who explained that "just prior" to the shooting Mueller had called and "threatened to kill him." (Respondent's Exhibit 11 at 55–56) Barnes told police that although he was not home when the shooting took place, he "knew" Mueller "did this." (Respondent's Exhibit 11 at 14)

Barnes directed police to the house where Mueller stayed.  Police found a vehicle that matched the description of the car from the first shooting.  A man was getting out of the car when police arrived, and Barnes identified him as Mueller. Law enforcement detained Mueller in a police vehicle.  Aaron Saunders, a witness to the first shooting, arrived on the scene and identified Mueller "as the person he saw in the car."  (Respondent's Exhibit 11 at 18–19)  Before transporting Mueller to the police station, Detective Brockew told Mueller that "the vehicle he was driving was reportedly seen at the [location of the first] shooting."  (Respondent's Exhibit 11 at 106)  Mueller "indignantly [] asked where" the shooting had occurred. (Respondent's Exhibit 11 at 106)  Detective Brockew "offered the location of Lime Street"; Mueller responded, "I didn't do anything to those n****rs."  (Respondent's Exhibit 11 at 106)

After the presentation of testimony, the court orally denied the motion to suppress (Respondent's Exhibit 11 at 115–18):

> THE COURT:  Okay.  Your mistake in this process is to assume that there has to be, in your mind, something definitive.  Probable cause is everything they knew that goes into the decision at that particular time.  And what they knew were the threats to Barnes, which were recent, which were specific, which you made, which he knew you made, which were made because of the specific difficulties that you had with Barnes, so when Barnes came home to find his house shot up, even though he didn't see you firing it, he knew in his mind that you were the only person that realistically probably would have done that, so that's part of it.
>
> The other part of it is the description of the vehicle, which was fairly specific even though you disagree whether it was gray versus gold, but they testified they believed it was

gold.  It was a unique vehicle that was specifically described.  It was found in an area close to where the original first shooting scene was, on Lime, and of course it was found a couple blocks away, two and two, from the second crime scene which would have been at Barnes' house.

So you had the description, they had yourself getting out of the vehicle right — being in the street right near the vehicle.  You have Saunders identifying you as the driver of that particular vehicle at the time when the shooting occurred, and that's circumstantial, but the vehicle is near the person that got shot, the shots rang out, he identifies you as the driver of the vehicle.  A logical inference from that is [] that the person driving was the person shooting.

And then you have the statement that you made, still at the scene, before they transported you to the officer.  And I quote, because I'm not otherwise saying that, "I didn't do anything to those n****rs," referring to the two black gentlemen, apparently one of which was shot being approached in a drug deal.

So when you put all of those things together, there's certainly probable cause.  That's not proof beyond a reasonable doubt.  Probable cause is the standard to make an arrest.  And the fact that nobody said at the time that's the guy that fired the shots, you somehow mistake that there has to be that particular statement before that can reach the level of probable cause.

Mr. Nohlgren [Mueller's former attorney] was smart enough to realize that all of those things together would be sufficient for the officers to take that action, and that's why he didn't presumably file the motion to suppress.

But when you put all of that together, the prior threats to Barnes, the two shooting scenes, the description of the vehicle, the closeness of where the vehicle is found, your ties to the vehicle, Saunders ID'ing you as the driver, and the statement you made showing knowledge of what probably occurred over there, or showing knowledge of what happened, to at least who the victims were and referring to them in that way, that's certainly, when you

put all of that together, is probable cause for a police
officer to believe that you were the person that was
involved in those crimes.

And when they bolster that probable cause by getting
subsequent identifications, positive identifications, of you
as the shooter, then you wind up potentially with proof
beyond a reasonable doubt, which in this case at least one
jury has already found, so that's the basis of the ruling.

You think that it has to be somebody saying I was the guy
that fired the shots over on Lime Street before they had
PC.  My finding is no, they do not.  Based on all of the
facts and circumstances that I've put together, I think there
was sufficient probable cause.

Because the trial court correctly denied Mueller's motion to suppress,

appellate counsel did not perform deficiently by failing to challenge the ruling on

direct appeal.  *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000)

("Appellate counsel is not ineffective for failing to raise claims reasonably considered

to be without merit.").   "[I]nvoluntary transport to a police station for questioning is

sufficiently like arrest to invoke the traditional rule that arrests may constitutionally

be made only on probable cause."  *Kaupp v. Texas*, 538 U.S. 626, 630 (2003).

"Probable cause exists where the facts within the collective knowledge of law

enforcement officials, derived from reasonably trustworthy information, are

sufficient to cause a person of reasonable caution to believe that a criminal offense

has been or is being committed."  *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir.

2018).  Probable cause requires only "a probability or substantial chance of criminal

activity, not an actual showing of such activity."  *Illinois v. Gates*, 462 U.S. 213, 243

n.13 (1983).

Law enforcement had probable cause to arrest Mueller.  By the time Mueller was taken to the police station, police (1) knew that an eyewitness had identified Mueller as the driver of a vehicle seen leaving the location of the first shooting, (2) knew that an officer had found Mueller exiting a vehicle that matched the description of the car from the first shooting, (3) knew that Barnes had identified Mueller as the person who shot at his house shortly after threatening to kill him, and (4) knew that Mueller independently knew the race of the first shooting victim.  These facts were cumulatively "sufficient to cause a person of reasonable caution to believe that a criminal offense ha[d] been . . . committed." *Gates*, 884 F.3d at 1298.  Therefore, the trial court correctly denied Mueller's first motion to suppress, and appellate counsel did not perform deficiently by failing to raise the issue on direct appeal.

In his second motion to suppress, Mueller argued that all post-arrest identifications were inadmissible because Officer Wireman's police report included two false statements.  (Respondent's Exhibit 18 at 1)  First, Officer Wireman asserted that Barnes had identified Mueller as "the subject who shot at his house." (Respondent's Exhibit 18 at 1)  Second, Officer Wireman stated that Sgt. Mackenzie had "placed [Mueller] in the back seat of a marked patrol car."  (Respondent's Exhibit 18 at 1)  Mueller contended that these allegedly false statements were "necessary to the finding of probable cause for initial arrest."  (Respondent's Exhibit 18 at 1)  Based on these allegations, Mueller requested a *Franks*[7] hearing.  The trial

---

[7] *Franks v. Delaware*, 438 U.S. 154 (1978).

court denied the motion because it "raised the same grounds that we've already gone over in the original motion to suppress." (Respondent's Exhibit 12 at 9)

The second motion to suppress lacked merit. Therefore, appellate counsel did not perform deficiently by failing to challenge the denial of the motion on direct appeal. *See Nyhuis*, 211 F.3d at 1344 ("Appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit."). To justify a *Franks* hearing, a defendant must "make[] a substantial preliminary showing" that an officer made intentionally false or recklessly misleading statements necessary to a probable-cause finding. *Franks*, 438 U.S. at 155–56. Mueller did not make the required showing.

The first statement — that Barnes identified Mueller as the man who shot at his house — was not false. Barnes was away from home during the shooting, but he told police that he "knew" Mueller "did this" because during a phone call "just prior" to the shooting, Mueller had "threatened to kill him." (Respondent's Exhibit 11 at 14, 55–56) Consequently, the first statement was accurate, and its inclusion in the police report did not entitle Mueller to a *Franks* hearing.

Mueller argued that the second statement was false because Officer Wireman, not Sgt. Mackenzie, "placed him in the back of the police car." (Respondent's Exhibit 18 at 1–2) Even assuming this statement was false, Mueller cannot show it was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 156.

The trial court correctly denied Mueller's two motions to suppress.  As a consequence, appellate counsel did not perform deficiently by failing to challenge the rulings on direct appeal.  Ground two is denied.

## VI. <u>CONCLUSION</u>

Mueller's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Mueller and **CLOSE** this case.

### CERTIFICATE OF APPEALABILITY
### <u>AND LEAVE TO APPEAL *IN FORMA PAUPERIS*</u>

Because Mueller fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate both the merits of the grounds and the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Mueller must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on March 7, 2024.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE